## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NATIVE AMERICAN | ) | |
| DISTRIBUTING, a Division of Flat | ) | |
| Creek Cattle Co., Inc., a Missouri | ) | |
| Corporation, and JOHN DILLINER, | ) | |
| an individual, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 05-CV-427-TCK-SAJ** |
| | ) | |
| SENECA-CAYUGA TOBACCO, | ) | |
| COMPANY, an enterprise of the | ) | |
| Seneca-Cayuga Tribe of Oklahoma, | ) | |
| LEROY HOWARD, an individual, | ) | |
| FLOYD LOCKAMY, an individual, | ) | |
| and RICHARD WOOD, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Before the Court are Defendants Leroy Howard, Floyd Lockamy, and Richard Wood's Motion to Dismiss (Doc. 12) and Defendant Seneca-Cayuga Tobacco Company's Motion to Dismiss Based Upon Tribal Sovereign Immunity (Doc. 41). Therein, individual Defendants Leroy Howard ("Howard"), Floyd Lockamy ("Lockamy"), and Richard Wood ("Wood") (collectively "Individual Defendants") and Defendant Seneca-Cayuga Tobacco Company ("SCTC") argue that the Court lacks jurisdiction because they enjoy tribal sovereign immunity from suit. For the reasons set forth below, such motions are granted and all claims are dismissed with prejudice.

I.      **Factual Background**

A.      **Parties and Claims**

Plaintiff Native America Distributing ("NAD"), a Missouri corporation, was a distributor of SCTC's tobacco products for approximately four years.  Plaintiff John Dilliner ("Dilliner"), a Missouri resident, is a shareholder and officer of NAD.  Dilliner is also a member of the Seneca-Cayuga Tribe of Oklahoma, which is a federally recognized tribe of Indians.  NAD and Dilliner are referred to collectively as "Plaintiffs."   In general terms, SCTC was, at relevant times, an unincorporated tribal enterprise that manufactured and sold tobacco products.  Defendant Howard is a past Chief of the Tribe; Defendant Lockamy was at relevant times General Manager of SCTC; and Defendant Wood was at relevant times Plant Manager of SCTC.  The Individual Defendants and SCTC are collectively referred to as "Defendants."

According to the Complaint, NAD was a domestic and international distributor of SCTC's tobacco products pursuant to a series of oral and written agreements between NAD and SCTC.  (Compl. ¶ 10.)[1]  NAD alleges that SCTC, under the direction of the Individual Defendants, breached the series of oral and written agreements by, *inter alia*, (1) selling directly to NAD's customers and exclusive customers of NAD's lower-tier distributors; (2) permitting diversion of products by other, more favored distributors, into NAD's protected territories; (3) undercutting NAD's pricing in both domestic and international markets; and (4) authorizing NAD to open new territories and then refusing to sell products to lower tier distributors recruited by NAD.  (Compl. ¶¶ 22-30.)  These

_____

[1]  The only agreement between NAD and SCTC that is part of the record is an International Distributor Agreement ("IDA") entered June 5, 2002, whereby SCTC contracted with NAD to distribute SCTC's products in international markets.  (*See* IDA, Ex. 2 to Individual Defs.' Mot. to Dismiss.)

alleged actions by SCTC and the Individual Defendants form the basis of NAD's first cause of action for breach of contract.

Plaintiffs' second cause of action is denominated as one for "civil conspiracy."  In support of this cause of action, Plaintiffs allege, *inter alia*, that "SCTC, through the actions of its managers, Howard, Lockamy, and Wood in their individual capacities, conspired together to engage in unlawful acts by manipulating tobacco markets in Oklahoma and other states for the purpose of avoiding state tobacco escrow payments and state taxes."  (Compl. ¶ 32.)  It further alleges that Defendants "conspired together to engage in unlawful acts by permitting certain favored distributors to divert SCTC products between states with differing requirements under the Master Tobacco Settlement Agreement . . . and related laws, thereby manipulating tobacco markets for the benefit of the favored distributors and to the detriment of NAD and its lower-tier distributors, as well as the Tribe."  (*Id.* ¶ 36.)

By separate motions to dismiss, made pursuant to Federal Rule of Civil Procedure 12(b)(1), SCTC and the Individual Defendants contend that this Court lacks subject matter jurisdiction.  All Defendants argue the Court lacks jurisdiction based on the doctrine of tribal sovereign immunity.  The Individual Defendants also argue, albeit briefly, that the Court lacks an independent basis for federal subject matter jurisdiction.

### B.     Tribal Documents

#### 1.     The Corporate Charter

Before turning to the motions to dismiss, it is necessary to provide background on two critical tribal documents, which are discussed throughout the Order.  Pursuant to the Indian Reorganization Act, 25 U.S.C. § 461 ("IRA"), Indian tribes are authorized to organize for their

3

common welfare and to adopt a constitution and bylaws.  25 U.S.C. § 476(a).  Pursuant to a separate section of the IRA, Indian tribes are authorized to ratify a corporate charter issued by the Secretary of the Interior.  25 U.S.C. § 477.  The constitutional entity created pursuant to § 476 and the corporate entity created pursuant to § 477 are considered separate and distinct entities.  *See Ramey Constr. Co., Inc. v. Apache Tribe of the Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982).  Corporate charters issued by the Secretary of the Interior pursuant to § 477 "usually include a 'sue and be sued' clause to enable the tribes to engage in commercial activity as corporations without losing their sovereign immunity as tribes."  *Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. David L. Thompson*, 874 F.2d 709, 715 n.9 (10th Cir. 1989).

At issue in this case is the Corporate Charter of the Seneca-Cayuga Tribe of Oklahoma (the "Corporate Charter").  The Corporate Charter was issued by the United States Secretary of the Interior on May 29, 1937 and was ratified by a majority vote of the adult members of the Tribe on June 26, 1937.  (Corporate Charter, Ex. 1 to Individual Defs.' Resp. to Mot. to Dismiss.)  The Corporate Charter provides that the "name of this corporation shall be the Seneca-Cayuga Tribe of Oklahoma."  (*Id*.)  Thus, "the Seneca-Cayuga Tribe of Oklahoma" is the name of the Tribe as a constitutional entity, and it is also the name of the corporate tribal entity.  The Court will refer to the corporation created by the Corporate Charter as the "Tribal Corporation."  The Court will refer to the constitutional entity created pursuant to § 476 as simply the "Tribe."

The stated purposes of the Tribal Corporation are:

(a)  To define and safeguard the rights and powers of the Seneca-Cayuga Tribe of Oklahoma and its members;
(b) To advance the standard of living of the Tribe through the development of tribal resources, the acquisition of new tribal land, the preservation of existing land holdings, the better utilization of land and the development of a credit program for the Tribe;

4

(c) To promote in any other way the general welfare of the Indians of the Seneca-Cayuga Tribe of Oklahoma.

(*Id*.)   The Corporate Charter lists numerous "corporate powers" of the Tribal Corporation and provides, in relevant part:

> 3.  The Seneca-Cayuga Tribe of Oklahoma . . . shall have the following corporate powers as provided by Section 3 of the Oklahoma Indian Welfare Act of June 26, 1936.
> . . .
> (b)  To sue and be sued; to complain and defend in any court:  Provided, however, That the grant or exercise of such power shall not be deemed a consent by the Tribe or by the United States to the levy of any judgment, lien or attachment upon the property of the Tribe other than income or chattels specially pledged or assigned.

(*Id*.) Section 3(b) of the Corporate Charter, which is hereinafter referred to as the "Sue and Be Sued Clause," is the basis upon which NAD asserts a waiver of immunity by SCTC for purposes of the claims asserted in this case.  (*See* Compl. ¶ 5.)

### 2.   Tribal Resolution #03-070699

Also relevant is Seneca-Cayuga Tribe of Oklahoma Resolution #03-070699 (the "Resolution"), which is entitled a "Resolution of the Seneca-Cayuga Tribal Business Committee Creating a Tribal Enterprise for Tobacco Manufacture, Sale, and Distribution of Tobacco Products and to Approve a Management Agreement with Humble, Riggs & Associates LLC as Manager of the Tribal Enterprise."  (Resolution #03-070699, Ex. 6 to Individual Defs.' Mot. to Dismiss.)  The Resolution was passed by the Seneca-Cayuga Tribal Business Committee (the "Business Committee").  (*Id.*)[2]  The Resolution was signed by then-Chief Jerry R. Dilliner.[3]  The Resolution

---

[2]  The Business Committee is empowered to act on behalf of the Tribe pursuant to Article VI of the Constitution and By-Laws of the Seneca-Cayuga Tribe of Oklahoma (the "Tribal Constitution").  (*See* Tribal Constitution, Ex. 5 to Individual Defs.' Mot. to Dismiss.)

[3]  It is unclear whether former Chief Jerry Dilliner is related to Plaintiff John Dilliner.

does not expressly mention or name SCTC, the corporate Defendant in this case, but it is undisputed that the Resolution created the tribal enterprise that later became known as SCTC.  As to creation of this tribal enterprise, the Resolution provides:  "[T]he Seneca-Cayuga Tribal Business Committee hereby creates an operating division of the Tribe, a Tribal enterprise to engage in (a) the manufacture, sale, and distribution of tobacco products; and (b) any other lawful commercial activity; and declares such Tribal enterprise and its activities to be essential governmental functions of the Seneca-Cayuga Tribe."  (*Id.*)

Upon creation of this new tribal enterprise, the Tribe entered into a management agreement with a firm known as Humble, Riggs & Associates ("H&R").  The Resolution therefore further provides:

> The Seneca-Cayuga Tribal Business Committee approves the management agreement with Humble, Riggs & Associates LLC in the form attached hereto as Exhibit "A," which is incorporated and made a part of this Resolution and the Chief is hereby authorized to execute four originals of the management agreement on behalf of the Seneca-Cayuga Tribe and to seek United States Department of Interior, Bureau of Indian Affairs' approval of said management agreement.

(*Id.* (emphasis added).)[4]  According to Rick W. Riggs ("Riggs"), a partner of H&R, the management agreement between H&R and the Tribe included a waiver of sovereign immunity.  (*See* Riggs Aff., Ex. 1 to Plfs.' Sur-Reply in Opp. to Individual Defs.' Mot. to Dismiss.)  This is supported by the following clause in the Resolution:

---

[4]  The referenced management agreement is not attached to the Resolution and is not part of the record.  The Business Manager for the Tribe has certified that what was provided to the Court is the "full, true and complete copy of the Resolution as the same remains on file in the Tribal Office."  (*Id.*)  Although the management agreement would have been a helpful addition to the record, the Court finds its absence does not materially affect the outcome of the case because it relates only to the management agreement between the Tribe and H&R and not to any agreements between Plaintiffs and Defendants.

> The Seneca-Cayuga Tribal Business Committee waives the Tribal immunity from suit only to the limits set out in said management agreement and only to Humble Riggs & Associates LLC for enforcement of the arbitration, forum, and other obligations, rights and duties set out in the management agreement in the form attached hereto as Exhibit "A."

Thus, there is language in the Resolution referencing a waiver of sovereign immunity, but such waiver of immunity is not relevant to the relationship between Plaintiffs and Defendants in this case.

## II.     Rule 12(b)(1) Standard

Rule 12(b)(1) motions based on lack of subject matter jurisdiction generally take one of two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995). First, a moving party may make a "facial attack on the complaint's allegations as to subject matter jurisdiction." *Id.* In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* at 1003. "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Id.* Instead, a court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* In such instances, "a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Id.*

As to the issue of whether an independent basis exists for federal jurisdiction, which was raised only by the Individual Defendants, the Individual Defendants do not rely on evidence outside the Complaint. Accordingly, the Court will decide this issue based on the face of the Complaint and accept all factual allegations in the Complaint as true. With respect to tribal sovereign immunity, both the Individual Defendants and SCTC rely on evidence outside the Complaint (*see, e.g.,*

7

Individual Defs.' Mot. to Dismiss, Exs. 1, 2, 4, 5, 6; SCTC's Reply in Support of Mot. to Dismiss, Exs. D, E) in challenging the basis upon which subject matter jurisdiction is based.   Specifically, Defendants have attacked Paragraph 5 of Plaintiffs' Complaint, wherein Plaintiffs assert that Defendants have waived their tribal sovereign immunity. (Compl. ¶ 5 ("Section 3(b) of such corporate charter provides that the Tribe has the power 'to sue and be sued' . . ., which . . . confers jurisdiction upon this Court for purposes of this action.").)  Plaintiffs have countered this attack with evidentiary materials of their own. (*See, e.g.*, Plf.'s Resp. to Individual Defs.' Mot. to Dismiss, Exs. 1, 2; Plf.'s Sur-reply Br. in Opp. to Individual Defs.' Mot. to Dismiss, Exs. 1, 2.)  Thus, the Court may rely on evidence outside the pleadings in resolving the issue of tribal sovereign immunity without converting the motion to one for summary judgment.[5]

## III.    Independent Basis for Federal Jurisdiction

In their motion to dismiss, the Individual Defendants argue the Court lacks subject matter jurisdiction under 28 U.S.C. §§ 1331 or 1332.   In response, Plaintiffs argue the Complaint is sufficient to plead federal claims arising under the Sherman Act, 15 U.S.C. § 1, *et seq*., despite Plaintiffs' failure to expressly reference the Sherman Act in its Complaint.  Plaintiffs  further argue that the issues presented require interpretation of tribal documents, including the Corporate Charter, and that interpretation of such documents is sufficient to create federal question jurisdiction.  In their Reply, the Individual Defendants do not dispute that Plaintiffs' second cause of action states a claim under the Sherman Act and make no further attempt to demonstrate that the Complaint does not raise

---

[5]  Magistrate Judge Frank H. McCarthy denied Plaintiffs the opportunity to conduct discovery on jurisdictional issues, and the Court affirmed this ruling.  (*See* Docs. 31, 36.)  The Court again finds there are no questions presented upon which discovery would potentially assist Plaintiffs.

a federal question, leading the Court to believe that the Individual Defendants concede this point and rely exclusively on sovereign immunity as their basis for dismissal.  Nonetheless, the Court has an obligation to consider whether there is an independent basis for federal subject matter jurisdiction. *See 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044,1048 (10th Cir. 2006) (stating that federal courts have an independent obligation to determine whether subject-matter jurisdiction exists).  The Court must consider this issue before it considers the jurisdictional issue of tribal sovereign immunity.  *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) ("[A]lthough tribal sovereign immunity is jurisdictional in nature, consideration of that issue always must await resolution of the antecedent issue of federal subject-matter jurisdiction.").

In their second cause of action, Plaintiffs allege that Defendants, *inter alia*,  conspired to engage in unlawful acts by manipulating tobacco markets in Oklahoma and other states for the purpose of avoiding state tobacco escrow payments and state taxes.  Plaintiffs further allege that Defendants conspired to engage in unlawful acts by permitting certain favored distributors to divert SCTC products between states with differing requirements under the Master Tobacco Settlement Agreement, thereby manipulating tobacco markets for the benefit of certain favored distributors. (Compl. ¶¶ 31-42.)  Accepting these allegations as true, and in the absence of any argument by Defendants to the contrary, the Court concludes that these allegations are sufficient to plead a cause of action under Sections 1 and 13a of the Sherman Act.  These Sections of the Sherman Act prohibit, respectively, conspiracies in restraint of trade and conspiracies to engage in price discrimination. *See* 15 U.S.C. §§ 1, 13a.  Accordingly, the Court finds that the Complaint presents a federal

question, such that the Court has an independent basis for jurisdiction pursuant to 28 U.S.C. § 1331.[6]

## IV.    Sovereign Immunity of SCTC

### A.    Sovereign Immunity Generally Extends to Commercial Activities of Tribes and Sub-entities of Tribes

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751 (1998). Traditionally, courts have regarded tribal immunity as "an aspect of the tribes' inherent sovereignty" and have "treated tribal immunity as 'necessary to preserve the autonomous political existence of the tribes and to preserve tribal assets.'" *Ute Distribution Corp. v. Ute Indian Tribe*, 149 F.3d 1260, 1264 n.7 (10th Cir. 1998). In 1998, the Supreme Court questioned these traditional bases for tribal immunity:

> There are reasons to doubt the wisdom of perpetuating the doctrine. At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect

---

[6] Interpretation of the Corporate Charter, which was issued by the Secretary of the Interior pursuant to the IRA, may also present a federal question that would give rise to jurisdiction pursuant to 28 U.S.C. § 1331. *See Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Okla.*, 725 F.2d 572, 575 (10th Cir. 1984) ("An inquiry into whether Congress has in fact limited tribal sovereign immunity in a given case necessarily triggers federal concerns."). *But see Ninigret Dev. Corp.*, 207 F.3d at 28 (stating that the "mere presence of a tribal sovereign immunity defense does not, in and of itself, 'convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law'") (quoting *Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841 (1989)). The Court does not reach this question but instead bases the existence of subject matter jurisdiction on the federal question created by the claim arising under the Sherman Act. The Court also does not reach the question of whether diversity jurisdiction exists. However, the Court observes that an "Indian tribe is not considered to be a citizen of any state" and "the presence of an Indian tribe destroys complete diversity." *Ninigret Dev. Corp.*, 207 F.3d at 27. Although the Tenth Circuit has indicated that "[a]n Indian tribe may become a corporation by being chartered under the Indian Reorganization Act, 25 U.S.C. § 477" and that "such a corporate entity may be considered a citizen of the state of its principal place of business for diversity jurisdiction purposes," s*ee Gaines v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993), the Court concludes, as explained in detail below, that SCTC is an enterprise of the Tribe and not the Tribal Corporation.

nascent tribal governments from encroachments by States.  In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce.  Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians.  In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

*Kiowa Tribe of Okla.*, 523 U.S. at 758 (citations omitted).[7]  Despite the Supreme Court's hesitancy to perpetuate the sovereign immunity doctrine in light of Indian tribes' significant presence in the global economy, the Court ultimately determined that it was Congress' role, and not that of the courts, to decide whether and under what circumstances to abrogate tribal immunity.  *Id.* (noting that "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests" and that "[t]he capacity of the Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area").  Accordingly, the Supreme Court declined to revisit case law and held that "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off reservation."  *Id*; *see also Ute Distribution Corp.*, 149 F.3d at 1264 n.7 ("[U]ntil Congress acts, tribes are entitled to immunity form suit.").  Thus, absent an express waiver by Congress or a tribe itself, the doctrine of tribal immunity extends to commercial activities of tribes.

In addition, as a general rule, sovereign immunity of tribes extends to sub-entities or enterprises of a tribe.  *See Ramey Constr. Co., Inc. v. Apache Tribe of the Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982) (reasoning that, based on trial court's finding that resort was a sub-entity of the tribe rather than a "separate corporate entity," the resort was "clothed with the

---

[7]  SCTC is a multi-million dollar tobacco that sells tobacco products in the domestic and international market.  It is an example of the type of tribal enterprise "that take[s] part in the Nation's commerce," as described by the Supreme Court in *Kiowa Tribe*.

sovereign immunity of the Tribe"); *S. Unique Ltd. v. Gila River Pima-Maricopa Indian Cmty.*, 674
P.2d 1376, 1379 (Ariz. App. 1983) (reasoning that, absent an express waiver, subordinate economic
organizations of Indian tribes are immune from suit).  In this case, it is undisputed that SCTC was,
at relevant times, an enterprise or sub-entity of either the Tribe or the Tribal Corporation, rather than
a wholly separate corporate entity.  (*See Compl.* ¶ 3 (identifying SCTC as an "enterprise of the
Tribe"); IDA, Ex. 2 to Individual Defs.' Mot. to Dismiss (stating in opening paragraph of contract
that SCTC is an "enterprise of the Seneca-Cayuga Tribe"; SCTC Resolution, Ex. 6 to Individual
Defs.' Mot. to Dismiss at 1 (stating in "whereas" paragraph of tribal resolution that entity created
by Tribe to engage in manufacture, sale, and distribution of tobacco products is "an operating
division of the Tribe".).)[8]  Indeed, Plaintiffs do not contend that SCTC was never entitled to
sovereign immunity due to its lack of affiliation with the Tribe.  Plaintiffs contend that SCTC has
expressly waived immunity because it is an enterprise of the Tribal Corporation that is subject to the
Sue and Be Sued Clause in the Corporate Charter.  (Compl. ¶ 5.)  Accordingly, SCTC is a tribal
entity that  is "clothed with the sovereign immunity of the Tribe" absent an express waiver of such
immunity.  *See Ramey*, 673 F.2d at 320.

**B.      Waiver by Virtue of "Sue and Be Sued Clause" in Corporate Charter**

A waiver of sovereign immunity cannot be implied but must be unequivocally expressed.

_____

[8]  Without supporting documentation or explanation, Plaintiffs state that "SCTC has
recently been incorporated under a new tribal statute."  (Plfs.' Sur-Reply in Opp. to SCTC's
Mot. to Dismiss Dilliner 4.)  The Court is unsure of the basis for this statement or what effect
this "incorporation" has on SCTC's status.  However, the current status of SCTC is irrelevant
because jurisdiction "depends upon the state of things at the time of the action brought." *Symes
v. Harris*, 472 F.3d 754, 758 (10th Cir. 2006) (quotation omitted).  Specifically, "jurisdiction
depending on the condition of the parties [] is governed by that condition as it was at the
commencement of the suit." *Id.*

*Ute Distribution Corp.*, 149 F.3d at 1263.  In this case, Plaintiffs rely on the Sue and Be Sued Clause in the Corporate Charter as SCTC's express waiver of immunity for purposes of SCTC's dealings with Plaintiffs.  Under Tenth Circuit law, sue and be sued clauses in corporate charters function as express waivers of immunity if they are found to apply to the tribal entity sued in the litigation.  *See id.* at 1268 ("Although courts have held that a 'sue and be sued' clause in a tribe's corporate charter may constitute a waiver of immunity of the tribal corporation, this waiver is limited to actions involving the corporate activities of the tribe and does not extend to actions of the tribe in its capacity as a political governing body")*; Ramey Constr. Co.*, 673 F.2d at 320 (finding that "sue and be sued" clause in a tribal corporate charter did not serve as a waiver of sovereign immunity in that case because the plaintiff contracted and dealt only with the tribe as a constitutional entity and not with the tribal corporate entity).  The difficult issue when dealing with a sue and be sued clause is not whether the language contained in the clause is sufficiently explicit to constitute a waiver; it is whether the clause actually applies to the tribal entity being sued.  *See, e.g., S. Unique Ltd.*, 674 P.2d at 1381 ("The threshold question that must be answered is whether the 'sue and be sued clause' in the corporate charter has any application to this case.").

Unlike the Tenth Circuit cases of *Ramey* and *Ute*, wherein the tribes were named defendants, the Tribe itself is not a named Defendant in this lawsuit.  Therefore, the precise issue is not whether suit has been brought against the Tribe as a constitutional entity or the Tribe as a corporate entity.  *See, e.g., Ute Distribution Corp.*, 149 F.3d at 1269 (remanding case "to the district court to determine whether the tribal corporate entity is both a named and proper defendant in this case" where named defendant was the "Ute Indian Tribe" and the Complaint was ambiguous as to whether

tribe was being sued as constitutional entity or corporate entity).[9]  Nor is the precise issue whether Plaintiffs contracted and dealt with the Tribe as a constitutional entity or a corporate entity.  *See, e.g., Ramey Constr. Co.*, 673 F.2d at 320 (holding that "[a]lthough the evidence on these issues was disputed at trial, the record supports both of the district court's findings [that plaintiff contracted and dealt with tribe as governmental entity and not corporate entity]" and that "the consent to suit clause in the corporate charter of the [tribe] in no way affects the sovereign immunity of the Tribe as a constitutional entity).

Instead, in this case, it is undisputed that Plaintiffs contracted and dealt with a tribal "enterprise" known as SCTC.  In this situation, the crucial question becomes whether SCTC, in its dealings with Plaintiffs, functioned as an enterprise of the Tribe or the Tribal Corporation.  *See S. Unique Ltd.*, 674 P.2d at 1378 (in determining whether an enterprise of the tribe known as Gila River Farms ("GRF") was entitled to tribal sovereign immunity, stating issue as whether GRF was an "entity created by and under the control" of the tribal corporation or whether GRF was a "subordinate economic organization" of the tribal governmental organization).  If SCTC is an enterprise of the Tribe (as a governmental entity), immunity has not been waived.  If SCTC is an enterprise of the Tribal Corporation, immunity has been waived by virtue of the Sue and Be Sued Clause in the Corporate Charter.  *See S. Unique Ltd.*, 674 P.2d at 1381-82.[10]

---

[9]  Due to changes in the procedural posture of the case following remand, the Ute Tribe voluntarily waived sovereign immunity. *Ute Distribution Corp. v. Norton*, No. 01-4020, 2002 WL 1722061, at * 2 (10th Cir. July 25, 2002). Thus, it appears the district court never addressed this issue on remand.

[10]  In framing the issue in this manner, the Court rejects two initial arguments made by SCTC.  First, the Court rejects the argument that a sue and be sued clause in a tribal corporate charter is not itself a waiver of immunity but instead a clause that grants the power to waive immunity in particular instances.  *See Ramey Constr. Co.*, 673 F.2d at 320 (finding that sue and

**C.     Status of SCTC as Enterprise of Tribe or Tribal Corporation**

In determining whether SCTC was, at relevant times, an enterprise of the Tribe or the Tribal

Corporation, the Court begins with the language of the Resolution, the general terms of which are

described above.   In the Resolution, the Business Committee expressly "declares such Tribal

enterprise [SCTC] and its activities as *essential governmental functions* of the Seneca-Cayuga

Tribe."  (Ex. 6 to Individual Defs.' Mot. to Dismiss.)  This resolution was passed July 6, 1999,

before any events giving rise to the lawsuit took place and before SCTC entered any contracts with

Plaintiffs.  Thus, the Tribe declared at the time it formed SCTC that SCTC would function as an

operating division of the Tribe in its governmental capacity.  In addition, Paul Spicer ("Spicer"),

Chief of the Tribe at the time of SCTC's formation, testified:

> The Seneca-Cayuga Tobacco Company was created *as an operating division of the Tribe in its governmental capacity*, as is reflected in the resolution founding the Company.  The Seneca-Cayuga Tobacco Company is not operated as a federally chartered corporation. . . . The Seneca-Cayuga Tribe has never waived its sovereign immunity for the Seneca-Cayuga Tobacco Company in any of its dealings with Native American Distributing or John Dilliner.

(Spicer Aff., Ex. 4 to Individual Defs.' Mot. to Dismiss, ¶¶ 3,7 (emphasis added).)  Thus, the Tribe

currently declares that SCTC was created as an operating division of the Tribe as governmental

entity and not the Tribal Corporation.  The Court finds the Resolution and Spicer's testimony to be

compelling evidence that SCTC was formed as an enterprise of the Tribe and not the Tribal

_____

be sued clause could function as general waiver of immunity if tribe was dealing with contractor
in its corporate capacity).  Second, the Court rejects the argument that a sue and be sued clause
can only function as a waiver of immunity if the tribal corporation is itself a party to the relevant
contract.  *See id.* (considering potential waiver of immunity by various tribal defendants in
addition to the tribal corporation, without mentioning which entities were actually parties to the
contract).  The Individual Defendants did not raise these two arguments and framed the issue in a
similar manner to the Court.

Corporation.[11]

Plaintiffs make several arguments and offer their own evidence in an attempt to overcome the language in the Resolution. First, Plaintiffs point to the fact that the Tribe and the Tribal Corporation have the same name and are both run by the Business Committee. Plaintiffs argue that, in entering contracts with an "enterprise of the Seneca-Cayuga Tribe of Oklahoma," they dealt with an enterprise of the *corporate* "Seneca-Cayuga Tribe of Oklahoma" and not an enterprise of the *constitutional* "Seneca-Cayuga Tribe of Oklahoma." Identical names being given to a tribal governmental organization (formed pursuant to § 476) and a tribal corporation (formed pursuant to § 477) appears to be somewhat unique to the Seneca-Cayuga Tribe. *Cf. Ramey Constr. Co.*, 673 F.3d at 320 (noting district court's finding that plaintiff had dealt with Mescalero Apache Tribe rather than Mescalero Apache Tribe, Inc.); *S. Unique. Ltd.,* 674 P.2d at 1381-82 (addressing issue of whether sub-entity was enterprise of the tribal corporation known as "Gila River Pima-Maricopa Indian Community" or the constitutional organization of the tribe known as "Gila River Indian Community"). Thus, more so than in other cases, Plaintiffs had reason to be confused as to whether, in entering contracts with an enterprise of the Seneca-Cayuga Tribe of Oklahoma, it was actually

---

[11]  In further support of its position that SCTC is a not an enterprise of the Tribal Corporation, SCTC offered testimony that the Tribal Corporation is a mere "shell." (*See* Unsworn Decl. of Paul Spicer ("Spicer Decl."), Ex. E to SCTC's Reply in Support of Mot. to Dismiss, ¶ 7 ("For at least the last 41 years, the chartered corporation has existed only on the paper issued to the tribe by the federal government.").) Countering this evidence, Plaintiffs submitted a tribal resolution signed by Spicer on June 3, 2006, which invoked authority of the Corporate Charter in suspending tribal voting rights of a tribal councilperson. (*See* Resolution #31-060306, Ex. 1 to Plfs.' Surreply in Opp. to SCTC's Mot. to Dismiss; *see also* 11/17/06 Tr. of Prelim. Inj. Hrg., Ex. 1 to Plfs.' Supplementation of Record in Opp. to SCTC's Mot. to Dismiss (wherein legal counsel for the Tribe invoked the Corporate Charter as the authority for revocation of voting rights).) For purposes of resolving these motions to dismiss, the Court assumes the Tribal Corporation is an existing and active entity.

entering contracts with a governmental tribal entity or a corporate tribal entity.  However, the Resolution in this case expressly declares all acts of the tobacco company to be essential "governmental" functions of the Tribe, indicating that SCTC functions as an entity of the Tribe and not the Tribal Corporation.  *See generally S. Unique Ltd.,* 674 P.2d at 1379 (reasoning that language in "Plan of Operation" of tribal enterprise indicated that enterprise was a subordinate economic organization of the tribe).  Further, the Resolution makes clear that, in passing the Resolution, the Business Committee was acting pursuant to its powers under the Tribal Constitution, thereby supporting the conclusion that SCTC is an entity of the Tribe instead of the Tribal Corporation.  (*See* Resolution, Ex. 6 to Individual Defs.' Mot. to Dismiss (stating that the Business Committee is "empowered to act in behalf of the Tribe under Article VI of the Constitution and By-Laws").)

One court has stated that, even where there is some confusion caused by the names of the two entities, the corporate and constitutional tribal entities remain separate entities for purposes of the sovereign immunity analysis.  *S. Unique Ltd.,* 674 P.2d at 1381-82 (noting that "some confusion results from the use of the identifying word 'Community' in both the Corporate Charter . . . and the Constitution and Bylaws," but holding that they remained separate entities).  This same court found that a sue and be sued clause in a tribal corporate charter "has application only to transactions where the Indian Corporation is *clearly* acting in its capacity as a business corporation pursuant to [Section 477]."  *Id.* at 384-85 (emphasis added).  Due to the language in the Resolution, which was in existence at the time of all relevant events giving rise to Plaintiffs' claims, the Court cannot find that SCTC was "clearly" functioning as an entity of the Tribal Corporation.  The waiver of immunity in the Corporate Charter must be strictly construed, *see Ramey Constr. Corp.*, 673 F.2d at 320, and the Court does not find that the identical names of the Tribe and the Tribal Corporation are sufficient

17

to override the express language in the Resolution, which declares SCTC as performing essential "governmental" functions.

Second, Plaintiffs argue that SCTC was an entity of the Tribal Corporation because, notwithstanding language in the Resolution to the contrary, SCTC performed purely commercial activities rather than governmental activities.  There can be no question that SCTC, an international distributor of tobacco products, was a commercial enterprise.  However, the fact that a tribe is "engaged in an enterprise private or commercial in character, rather than governmental, is not material" because "[t]o construe the immunity to suit as not applying to suits on liabilities arising out of private transactions would defeat the very purpose of Congress in not relaxing the immunity, namely, the protection of the interests and property of the tribes and the individual Indians." *Maryland Cas. Co. v. Citizens Nat'l Bank*, 361 F.2d 517, 521-22 (5th Cir. 1966); *S. Unique Ltd.,* 674 P.2d at 1382 ("The distinction to be made is not between commercial and governmental functions in order to determine the availability of the defense of tribal sovereign immunity.").  The constitutional organization of a tribe is capable of operating a commercial venture, just like a tribal corporation.  *See S. Unique Ltd.,* 674 P.2d at 1382.  In fact, the Department of Interior has expressly recognized that a tribal governmental organization has broad or broader economic powers than a tribal corporation:

> Ordinarily it is safe to assume that a transaction of a so-called "organized tribe" is a transaction of the tribal municipal corporation [acting pursuant to section 16], which may have as broad or broader economic powers as its business corporation counterpart [acting pursuant to section 17]. Unless documentary evidence such as a conveyance to the business corporation or contractual agreement, by resolution or otherwise, gives the business corporation an agency or proprietary relationship to certain property, it can be assumed that the corporation is not directly involved.

*Id.* (citing Timber as a Capital Asset of the Blackfeet Tribe, Opinion No. M-36545 (Dec. 16, 1958)).

18

Thus, the fact that SCTC is a commercial enterprise does not inform the question of whether SCTC functioned as an entity of the Tribe or the Tribal Corporation.  In fact, the Department of Interior has indicated that, when dealing with an ambiguously named tribal enterprise that is involved in a commercial activity, other parties should "assume" they are dealing with the tribe as a governmental organization.  *See id.*

Third, Plaintiff Dilliner makes allegations regarding the reasonableness of his belief that, in dealing with SCTC, he dealt with the Tribal Corporation.  Specifically, he alleges, *inter alia*, that (1) he was aware that another company that had done business with SCTC had sued SCTC in federal court and the case was not dismissed; (2) he was aware that SCTC was not successful in challenging the "Tobacco Master Settlement Agreement" on sovereignty grounds; (3) he was never shown a copy of the Resolution declaring that SCTC was created to perform essential governmental functions; and (4) Wood, SCTC Plant Manager at relevant times, represented that a waiver of immunity was not necessary.  (*See* First Dilliner Aff., Ex. 2 to Plfs.' Resp. to Individual Defs.' Mot. to Dismiss, ¶¶ 2-3.)

To the extent Dilliner argues he formed a "reasonable belief" that he was dealing with a Tribal Corporation and was therefore unaware he was dealing with an immune tribal entity, such argument is simply irrelevant in the context of tribal sovereign immunity.  The Supreme Court has made clear that tribal sovereign immunity, "[i]n this economic context, . . . can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims."  *Kiowa Tribe of Okla.*, 523 U.S. at 758 (citations omitted).  This case is somewhat unique in that Dilliner was not a third party who was *unaware* of the doctrine of tribal immunity.  Instead, he alleges he was highly aware of the possible application

of tribal immunity, inquired about it, and was told by Wood that Plaintiffs did not need additional waivers of sovereign immunity beyond those in the Corporate Charter.  However, the Court is unaware of any case applying "estoppel" or any other equitable doctrine to bar application of sovereign immunity.  Instead, the Tenth Circuit has specifically cautioned that the "unequivocally expressed" standard for waiver of immunity is not to be flexibly applied and that courts may not find a waiver of immunity based on "perceived inequities arising from the assertion of immunity, or the unique context of a case."  *See Ramey Constr. Co.*, 673 F.2d at 1267.  This is true even if application of sovereign immunity leaves a party without any judicial remedy.  *Id.* at 1266 n.8.  Accordingly, the Court rejects Plaintiffs' arguments urging the Court to find a waiver of immunity based on the reasonableness of Dilliner's beliefs that he dealt with the Tribal Corporation or the inequities arising from alleged misrepresentations of Wood.

Dilliner further alleges, in the nature of a fairness argument, that he has observed that the Business Committee's "practice is to assume the status of a Tribe when it suits their immediate purpose, or the status of a business corporation, if that better suits their immediate purpose." (*See* Second Dilliner Aff., Ex. 3 to Plfs.' Resp. To SCTC Mot. to Dismiss.)  Dilliner alleges that, because the Tribe and the Tribal Corporation have the same name, the Tribe is able to abuse its powers by asserting sovereign immunity after the fact only when it suits its purposes.  Even assuming this type of consideration is appropriate in analyzing whether a waiver has occurred, which it is not, after-the-fact classification is not what occurred in this case.  Upon the initial formation of SCTC, the Business Committee declared the activities of SCTC to be essential "governmental" functions.  In the Court's view, the Business Committee made an election that the tobacco company would be an entity of the governmental organization of the Tribe and not the Tribal Corporation.  If the Tribe

20

were now before the Court arguing that SCTC was an entity of the Tribal Corporation, it would face an uphill battle based on the express declaration in the Resolution.

Fourth, Plaintiffs offered testimony of Riggs, a founding member of H&R, to show that the Business Committee's declaration of SCTC as a "governmental" organization was simply a fiction. According to Riggs, H&R was formed after Spicer, then Chief of the Tribe, approached investors about building a tobacco factory on Indian trust lands.  (*See* Riggs Aff., Ex. 1 to Plfs.' Sur-Reply in Opp. to Individual Defs.' Mot. to Dismiss, ¶ 2.)  Because the Tribe had insufficient funds to build, equip, and operate the tobacco factory, Spicer needed H&R to provide start-up capital and management expertise.  (*Id.*)  H&R agreed to fund, equip, and operate the tobacco factory in a vacant building located on Tribal land and split the profits with the Tribe.  (*Id.*)  According to Riggs, at the inception of SCTC and through early 2002, the Tribe had virtually no involvement with SCTC and did not operate or manage it.  (*Id.* ¶ 7.)  During "early 2002," when profits started reaching $1 million per month, the Tribe demanded that H&R relinquish its interest in the business or the factory would be closed, since the Tribe controlled the land where the factory was located.  (*Id.* ¶¶ 6, 8.)  H&R and the Tribe litigated their dispute and reached a settlement.  (*Id.* ¶ 6.)

Plaintiffs contend that Riggs' testimony, set forth above, as well as the testimony of Robert June ("June"), the original Plant Manager of SCTC, (*see* Aff. of Robert June, Ex. 2 to Plfs.' Sur-Reply in Opp. to Individual Defs.' Mot. to Dismiss), "paint a picture of a passive business involvement by the Tribe in a tobacco factory that was entirely funded, built, operated, and managed by non-Indians during the relevant time period." (Plfs.' Sur-Reply in Opp. to Individual Defs.' Mot. to Dismiss 8.)  However, the Court finds that whether the Tribe was passively or actively involved is not important to the question of whether SCTC waived immunity by virtue of the Sue and Be Sued

21

Clause in the Corporate Charter.  The testimony of Riggs and June is undisputed, and the Court has no reason to doubt that the Tribe initially played a minimal role in the operation of SCTC. Nonetheless, SCTC is located on tribal land and was expressly formed by the Business Committee as a "tribal enterprise."  There can be no doubt that the Tribe significantly benefited from SCTC's commercial endeavors and that SCTC is the type of entity capable of being clothed with the sovereign immunity of the Tribe.  Therefore, Riggs' and June's testimony is not relevant to the issue of waiver.

Finally, in light of the cumulative evidence explained above, Plaintiffs make several policy arguments against a finding of waiver of immunity in this case.  (*See, e.g*., Plfs.' Resp. to SCTC's Mot. to Dismiss ("Th[e] purpose [of tribal immunity] is not served, however, when a sophisticated, multi-million dollar tobacco company cynically uses tribal sovereign immunity as a shield to protect itself from prosecution for illegal business conduct, rather than a shield to protect limited . . . tribal resources.").  While Plaintiffs make some compelling arguments that tribal immunity is not, in this case, furthering the policy goals originally intended by Congress, the Tenth Circuit has clearly indicated that "policy concerns" have no place in the sovereign immunity analysis.  *See Ramey Constr. Co.*, 673 F.2d at 1267.  The Court has no authority to find a waiver of immunity based on policy concerns regarding whether Congress' intent is being furthered in a given case.

The Court concludes that the Resolution clearly declares SCTC to be an enterprise of the Tribe and not the Tribal Corporation, such that the Sue and Be Sued Clause in the Corporate Charter does not constitute an explicit waiver of SCTC's sovereign immunity, either in its dealings with Plaintiffs or in its actions forming the basis of the allegations in the second cause of action alleging conspiracies in restraint of trade.  Several aspects of this case - including the fact that the Tribe and

Tribal Corporation have the same name, the alleged representation by Wood that Plaintiffs did not need a waiver of immunity, the alleged initial lack of tribal involvement in managing SCTC, and the lack of an alternative judicial remedy - seem to render this a harsh result.  However, it is not this Court's role to revisit established legal principles or to ignore the requirement of an express waiver of immunity based on perceived inequities.  *See Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1379 (8th Cir. 1985) ("If injustice has been worked in this case, it is not the rigid express waiver standard that bears the blame, but the doctrine of sovereign immunity itself.  But it is too late in the day, and certainly beyond the competence of this court, to take issue with a doctrine so well-established.").  Accordingly, SCTC is immune from suit on the breach of contract claims and the "civil conspiracy" claims, which the Court has construed as claims arising under the Sherman Act.

**V.       Sovereign Immunity of Individual Defendants**

The protection of tribal sovereign immunity "extends to individuals acting in their representative capacity and within the scope of their authority."  *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir. 1985); *see also Dry v. United States*, 235 F.3d 1249, 1253 (10th Cir. 2000) ("[S]uits against tribes or tribal officials in their official capacity 'are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress.'").  In contrast, "sovereign immunity does not extend to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him."  *Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Okla.*, 725 F.2d 572, 576 n.1 (10th Cir. 1984).  In this case, the Individual Defendants sued by Plaintiffs are Howard, past Chief of the Tribe; Lockamy, former General Manager of SCTC; and Wood, former Plant Manager of SCTC.  The Individual Defendants

are expressly sued as "individuals" and in their "individual capacities." (*See* Compl. Caption & ¶¶ 32-33.)

Plaintiffs contend that all Individual Defendants acted outside the scope of their authority in committing the actions set forth in the Complaint, such that tribal immunity does not attach to their actions. Specifically, Plaintiffs argue that "the Tribe is not capable of bestowing power on individuals to engage in a civil conspiracy or violate the Sherman Act . . ., nor were such powers delegated to them by the Tribe." (Plfs.' Resp. to Individual Defs.' Mot. to Dismiss 15.) However, Plaintiffs' argument - that the Individual Defendants acted outside the scope of authority because the Complaint alleges wrongful actions - has been expressly rejected by the Tenth Circuit and other courts. *See Tenneco Oil Co.*, 725 F.2d at 576 ("Merely being wrong or otherwise actionable does not take an action outside the scope of immunity."); *State of Okla. ex rel. Okla. Tax Comm'n v. Graham*, 822 F.2d 951, 956-57 (10th Cir. 1987) (rejecting argument that tribal employee acted outside the scope of authority merely because petition alleged that employee failed to comply with state law); *Frazier v. Turning Stone Casino*, 254 F. Supp. 2d 295, 307 (N.D.N.Y. 2003) (rejecting plaintiffs' argument that, because Indian tribe could not lawfully bestow upon individual defendants the authority to violate state misappropriation laws, individual defendants were subject to suit in their individual capacities); *Bassett v. Mashantucket Pequot Museum & Research Ctr., Inc.*, 221 F. Supp. 2d 271, 281 (D. Conn. 2002) ("[I]t is insufficient for the plaintiffs merely to allege that [the individual defendants] violated state and federal law in order to state a claim that [they] acted beyond the scope of their authority; it would be tantamount to eliminating tribal immunity from damages actions because a plaintiff must always allege a wrong in order to state a claim for relief."). Instead, a tribal official, even if sued in an individual capacity, is only stripped of tribal immunity

24

when he acts "without any colorable claim of authority." *Bassett*, 221 F. Supp. 2d at 281; *see also Frazier*, 254 F. Supp. 2d at 310.

Based on review of the Complaint, it is clear that all allegations against the Individual Defendants relate to decisions made and actions taken by them as the "principal managers" of SCTC, an immune tribal enterprise. (*See, e.g., Compl.* ¶ 12 ("SCTC, under the direction of its principal managers, Howard Lockamy, and Wood, has repeatedly, intentionally and systematically breached the Agreements in many ways."); ¶ 33 ("SCTC, through the actions of its managers, Howard, Lockamy and Wood . . . in their individual capacities, conspired together to engage in unlawful acts by pursuing wholesale tobacco sales to the Muscogee (Creek) Nation on terms that would result in no Oklahoma state tobacco taxes or Oklahoma tobacco escrow payments being made.").) The subject of this lawsuit, and all claims asserted against the Individual Defendants, relate to wrongful actions taken in the course of managing and operating SCTC, which the Court has found to be an enterprise of the Tribe that is protected by immunity. Therefore, the Individual Defendants were acting on behalf of SCTC and were acting at all times with at least a "colorable claim of authority" from the Tribe. *See Frazier*, 254 F. Supp. 2d at 310 (holding that chief executive officer and marketing manager of Indian casino could not be sued in their individual capacities because "Plaintiffs have done nothing more than allege that [they] violated state law" and because complaint asserted they were "acting on behalf of the Oneida Nation and the Casino"); *Bassett,* 221 F. Supp. 2d at 281 (holding that individual defendants who were executive director and projects director of the Mashantucket Pequot Museum & Research Center could not be sued in individual capacities for tortious interference with contract because they acted with "colorable" authority of the tribe); *Romanella v. Hayward*, 933 F. Supp. 163, 167-68 (D. Conn. 1996) (holding that

negligence claims asserted against tribal officials related directly to performance of their official duties in maintaining parking lots and officials were therefore immune from suit).  Accordingly, tribal sovereign immunity extends to the alleged wrongful actions of the Individual Defendants in this case.

Plaintiffs also briefly argue that Individual Defendants Lockamy and Wood are not entitled to sovereign immunity because they were merely employees of SCTC and were not "tribal officials." (*See* Plfs.' Resp. to Individual Defs.' Mot. to Dismiss 15.)  However, the Tenth Circuit has extended immunity to a mere "tribal employee" who managed a motel, tobacco shop, and bingo game on behalf of the Chickasaw Nation, indicating that it is not necessary for the individual defendant to be a tribal officer or even a member of the tribe in order for tribal immunity to attach to an individual defendant's actions.  *See Graham*, 822 F.2d at 956-57; *see also Bassett*, 221 F. Supp. 2d at 277 (rejecting argument that tribal immunity extends only to high-level officers or officials who are performing governmental functions and holding that tribal immunity extends to all "tribal *employees* acting within their representative capacity and within the scope of their official authority") (emphasis added).  Accordingly, the Court finds that Lockamy and Wood's status as SCTC employees, rather than tribal officers or members of the Business Committee, does not change the sovereign immunity analysis.

For the reasons set forth above, Defendants Leroy Howard, Floyd Lockamy, and Richard Wood's Motion to Dismiss (Doc. 12) and Defendant Seneca-Cayuga Tobacco Company's Motion to Dismiss Based Upon Tribal Sovereign Immunity (Doc. 41) are GRANTED.  All claims against Defendants are hereby DISMISSED with prejudice.

IT IS SO ORDERED.

**Dated this 5th day of June, 2007.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

27